1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  GRETHER A. D.,                    )    NO. CV 20-3356-E
                                      )
12              Plaintiff,            )
                                      )
13     v.                             )    **MEMORANDUM OPINION**
                                      )
14  ANDREW SAUL, Commissioner of      )
    Social Security,                  )
15                                    )
                Defendant.            )
16  _____     )

17

18                        **PROCEEDINGS**

19

20     Plaintiff filed a complaint on April 9, 2020, seeking review of

21  the Commissioner's denial of benefits.  The parties consented to

22  proceed before a United States Magistrate Judge on October 28, 2020.

23  Plaintiff filed a motion for summary judgment on February 3, 2021.

24  Defendant filed a motion for summary judgment on April 19, 2021.  The

25  Court has taken the motions under submission without oral argument.

26  See L.R. 7-15; "Order," filed April 13, 2020.

27  ///

28  ///

**BACKGROUND**

Plaintiff filed an application for supplemental security income on January 30, 2017 (Administrative Record ("A.R.") 203-12). Plaintiff asserts disability since August 11, 2016, based on alleged "mental illness" (i.e., epilepsy and anxiety) (A.R. 51, 203, 238). An Administrative Law Judge ("ALJ") reviewed the record and heard testimony from Plaintiff, Plaintiff's mother and a vocational expert (A.R. 21-34, 39-67).[1]

The ALJ found that Plaintiff has severe epilepsy and anxiety (A.R. 23). However, the ALJ also found that Plaintiff retains the residual functional capacity to perform a range of medium work as defined in 20 C.F.R. § 416.967(c):

> She can lift, carry, push and pull 50 lbs. occasionally and
> 25 lbs. frequently. She can stand and/or walk for 6 hours
> in an 8-hour workday and sit for 6 hours in an 8-hour
> workday. She can never climb ladders, ropes, or scaffolds.
> She can occasionally climb ramps or stairs. She can
> occasionally balance, stoop, kneel, crouch, and crawl. She
> can frequently perform fine and gross manipulation. She

---

[1] Plaintiff had filed a previous application for benefits, which had been denied. See A.R. 75-86 (prior ALJ's decision), 91-96 (Appeals Council's prior denial of review), 100-08 (order and judgment in Grether A.D. v. Colvin, C.D. Cal. Case No. CV 15-04504-DTB, affirming the administrative decision). As detailed below, the present ALJ found new and material evidence demonstrating "changed circumstances" to rebut any presumption of continuing nondisability, and the ALJ proceeded through the sequential evaluation process (A.R. 21-34).

should have no exposure to unprotected heights or dangerous

machinery.  She cannot operate vehicles.  She can perform

simple, routine, and repetitive tasks, involving no fast

paced or production type work.  She should have no

interaction with the general public and have only occasional

interaction with supervisors and coworkers.  She cannot

perform work that requires teamwork or close collaboration

with others.

(A.R. 26).  The ALJ found that a person with this residual functional

capacity could work as a night cleaner (Dictionary of Occupational

Titles ("DOT") "358.687-010," medium work), cleaner (DOT

"323.687-014," light work), and advertising material distributor (DOT

"230.687-010," light work) (A.R. 33-34 (adopting vocational expert

testimony at A.R. 60-62)).  Accordingly, the ALJ denied benefits (A.R.

34).

The Appeals Council considered additional evidence, but denied

review (A.R. 1-5; see also A.R. 314-74).

**STANDARD OF REVIEW**

Under 42 U.S.C. section 405(g), this Court reviews the

Administration's decision to determine if: (1) the Administration's

findings are supported by substantial evidence; and (2) the

Administration used correct legal standards.  See Carmickle v.

Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue,

499 F.3d 1071, 1074 (9th Cir. 2007); see also Brewes v. Commissioner,

682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial evidence is "such
relevant evidence as a reasonable mind might accept as adequate to
support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401
(1971) (citation and quotations omitted); see also Widmark v.
Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

> If the evidence can support either outcome, the court may
> not substitute its judgment for that of the ALJ.  But the
> Commissioner's decision cannot be affirmed simply by
> isolating a specific quantum of supporting evidence.
> Rather, a court must consider the record as a whole,
> weighing both evidence that supports and evidence that
> detracts from the [administrative] conclusion.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and
quotations omitted).

Where, as here, the Appeals Council "considers new evidence in
deciding whether to review a decision of the ALJ, that evidence
becomes part of the administrative record, which the district court
must consider when reviewing the Commissioner's final decision for
substantial evidence."  Brewes v. Commissioner, 682 F.3d at 1163.
"[A]s a practical matter, the final decision of the Commissioner
includes the Appeals Council's denial of review, and the additional
evidence considered by that body is evidence upon which the findings
and decision complained of are based."  Id. (citations and quotations
///
///

omitted).[2]  Thus, this Court has reviewed the evidence submitted for
the first time to the Appeals Council.

## DISCUSSION

After consideration of the record as a whole, Defendant's motion
is granted and Plaintiff's motion is denied.   The Administration's
findings are supported by substantial evidence and are free from
material[3] legal error.   Plaintiff's contrary arguments are unavailing.

**I.   Relevant Portions of the Record**

**A.   The Treatment Evidence**

The record does not contain many treatment records relating to
Plaintiff's epilepsy.  Plaintiff presented to Bell Medical Clinic in
July of 2016, reporting that she had a seizure despite having taken
///

_____

[2]   And yet, the Ninth Circuit sometimes had stated that
there exists "no jurisdiction to review the Appeals Council's
decision denying [the claimant's] request for review."  See,
e.g., Taylor v. Commissioner, 659 F.3d 1228, 1233 (9th Cir.
2011); but see Smith v. Berryhill, 139 S. Ct. 1765 (2019) (court
has jurisdiction to review Appeals Council's dismissal of request
for review as untimely); see also Warner v. Astrue, 859 F. Supp.
2d 1107, 1115 n.10 (C.D. Cal. 2012) (remarking on the seeming
irony of reviewing an ALJ's decision in the light of evidence the
ALJ never saw).

[3]   The harmless error rule applies to the review of
administrative decisions regarding disability.  See Garcia v.
Commissioner, 768 F.3d 925, 932-33 (9th Cir. 2014); McLeod v.
Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011).

her medications daily (A.R. 377; see also A.R. 388 (report of same)).
Her medications were continued (A.R. 378).

In October of 2016, Plaintiff presented to neurologist Dr.
Munther Hijazin, reporting a history of seizures since age seven,
developmental delay, a learning disability, forgetfulness, depression,
anxiety and headaches, for which Dr. Hijazin continued Plaintiff's
medications (A.R. 381, 384-85).  In December of 2016, Plaintiff
reportedly was doing well and had not had a seizure since June or July
of 2016 (A.R. 381, 383, 565; see also A.R. 388-92, 560-70 (neurology
treatment notes in 2016 and 2017 reporting no new seizures)).  In May
and October of 2018, Plaintiff reported no new seizures since January
of 2018 (A.R. 571, 574).  The record does not contain any treatment
notes regarding any January, 2018 seizure.

Plaintiff returned to the Bell Medical Clinic in May of 2018,
complaining of almost daily migraines (A.R. 514-15).  Plaintiff then
began a trial of Imitrex (A.R. 514-15).

Mental health treatment notes generally suggest that Plaintiff's
symptoms of depression and anxiety were adequately controlled with
medications.  See, e.g., A.R. 407 (February, 2016 note reporting
control); A.R. 413 (April, 2016 note reporting Plaintiff was "doing
well"); A.R. 416 (June, 2016 note reporting Plaintiff was "doing good
in school"); A.R. 419 (August, 2016 note reporting Plaintiff was
"doing well on her meds"); A.R. 422 (September, 2016 note reporting
Plaintiff was "responding well to meds"); A.R. 485 (September, 2017
note reporting Plaintiff had been taking her medication and

"everything is fine"); A.R. 476 (January, 2018 note reporting
Plaintiff was "taking her meds as rx'd and noticing feeling better, no
mania, no psychosis, > mood/energy, feeling happy. . . ."); A.R. 494
(April, 2018 note reporting that Plaintiff felt things were "good" and
she was happy); A.R. 495 (July, 2018 note reporting that Plaintiff was
"ok" and doing well).

Starting in January of 2016, Plaintiff attended mental health
treatment by telephone (A.R. 431-47).  In March of 2016, Plaintiff
reported concern in connection with school and her "SSI appeal" –
Plaintiff "[did] not want to affect her eligibility" (A.R. 433).
Plaintiff reportedly was encouraged to enroll back in her continuation
program to get her GED (A.R. 433). In June and August of 2016,
Plaintiff expressed concern over financial stressors and sought help
applying for a reduced fare bus pass so she could attend school (A.R.
435-37).  Plaintiff's treatment provider went to her home later in
August of 2016, due to Plaintiff's isolation and supposed difficulty
"motivating self" (A.R. 438).  In October of 2016, Plaintiff's
provider reported that Plaintiff had symptoms of depressed mood which
"display impairments in employment, education and social support"
(A.R. 441).  However, in November of 2016, Plaintiff reported that
things were "good" and she was not having any problems or symptoms at
that time (A.R. 442).

A "Community Functioning Evaluation" from October of 2016
asserted that Plaintiff needed assistance with her social skills and
her independent/daily living skills in that she: (a) had difficulty
developing friendships and interacting with others because of her

anxiety; (b) needed help from her mother with daily activities; and
(c) needed reminders due to poor concentration and anxiety (A.R. 406).
However, a January, 2017 mental status examination reported results
within normal limits (A.R. 400-02).   A January, 2018 mental status
examination also reported results within normal limits (A.R. 462-64).

In February of 2018, another "Community Functioning Evaluation"
asserted that Plaintiff needed assistance with concentration and time
management skills because Plaintiff supposedly was having "difficulty
concentrating and completing tasks" (A.R. 467).   At that time,
Plaintiff denied any depressive episodes (A.R. 468).   In July of 2018,
Plaintiff reported that she needed only two classes to complete her
GED and then she might transfer to college (A.R. 496).   Plaintiff
asked how doing so might affect her SSI appeal (A.R. 496).   Plaintiff
stated that she wanted to continue with school and, if possible, "get
a career," but she was afraid her mother "might get mad" (A.R. 496).

In August of 2018, Plaintiff indicated that she had no major
depressive episodes, that she had been denied SSI for her epilepsy and
that she was "now using mental health as a reason for SSI application
submittal" (A.R. 470; but see A.R. 497 (August, 2018 treatment note
indicating that Plaintiff said she had been "fine" and things were
good).   Her treatment provider noted, "I'm uncertain as to why she &
family feel she is unable to work.   Family tends to be protective of
her, she states that mother has her doing a lot of chores & she is
unable to go out or have a BF [boyfriend]" (A.R. 470).

///

///

In September of 2018, Plaintiff reported that she was in the process of ending her classes and that she wanted to start a program to train for a job (A.R. 498).  However, she "did not want her case for SSI to be affected by her decision" (id.).  In October of 2018, Plaintiff reportedly was interested in applying for a vocational program through the Department of Rehabilitation, but Plaintiff had been informed by a representative of the Department that applying for a vocational program might affect Plaintiff's SSI appeal (A.R. 500).

## B.   **The Opinion Evidence**

Consultative examiner Dr. Rosa Colonna examined Plaintiff and prepared a Complete Psychological Evaluation, dated April 12, 2017 (A.R. 450-54).  Plaintiff reported having had a seizure disorder since she was seven years old, and depression, anxiety and insomnia since 2008 (A.R. 451).  Plaintiff was attending "English as a second language classes" and reported she was able to do her personal care and household chores, use the computer and watch television (A.R. 451).  On mental status examination, Plaintiff's effort was "suboptimal," her intellectual functioning was estimated to be in the low average range, she had a euthymic mood, mildly diminished memory, attention and concentration, poor fund of knowledge, and an IQ score of 80 (which Dr. Colonna believed to be an underestimation "particularly on the memory testing due to inconsistencies with reported activities of daily living") (A.R. 452-53).  Dr. Colonna diagnosed dysthymia, high borderline to low average intellectual functioning per testing and probable low average intellectual functioning per activities of daily living (A.R. 453).  Dr. Colonna

assigned a Global Assessment of Functioning ("GAF") score of 60
(id.).[4]  Dr. Colonna opined that Plaintiff would be able to
understand, remember and carry out short, simplistic instructions
without difficulty, would have mild inability to understand, remember
and carry out detailed instructions, could make simplistic work-
related decisions without special supervision, could interact
appropriately with supervisors, coworkers and peers, and could manage
finances on her own (A.R. 453-54).

Consultative psychologist Dr. Steven I. Brawer examined Plaintiff
and prepared a Psychological Evaluation, dated January 28, 2019 (A.R.
577-84).  Plaintiff appeared slightly withdrawn, with mildly limited
receptive and expressive verbal abilities and mild attentional
deficits which required that questions and instructions be repeated on
occasion (A.R. 577).  Plaintiff appeared "to be putting forth an
adequate effort" (A.R. 577).  Plaintiff reported suffering grand mal
seizures approximately once a year (A.R. 578).  She last submitted a
job application three to four years earlier (A.R. 578).  Plaintiff
reported that she was depressed because she stays at home and does not
study or work (A.R. 578).  Plaintiff reportedly was worried by her
"depression and future suicidal thoughts" (A.R. 578).  Plaintiff said
that her problems affect her ability to work "because I'm worried that

---

[4]     The GAF scale is used by clinicians to report an
individual's overall level of functioning. See American
Psychological Association, Diagnostic and Statistical Manual of
Mental Disorders 34 (4th ed. 2000) ("DSM").  A GAF of 51-60
indicates "[m]oderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) or moderate
difficulty in social, occupational, or school functioning (e.g.,
temporarily falling behind in schoolwork)."  Id.

I'll faint and have seizures" (A.R. 578).  Plaintiff reportedly was
able to manage her personal care, do household chores (but not
cooking), go shopping, run errands, exercise at the gym, talk on the
telephone, watch television, listen to music and take bus
transportation with others (A.R. 579).  On mental status examination,
Plaintiff had somewhat concrete thinking, slightly withdrawn mood,
constricted affect with current symptoms of depression and anxiety
reported, and somewhat mildly diminished attention span, but an
ability to sustain concentration and to work without distraction
"during performance tasks" (A.R. 580).  Testing placed Plaintiff in
the borderline range of nonverbal intelligence, in the low average
range for visual memory, in the borderline range for auditory memory,
visual working memory, intermediate memory and delayed memory, in the
borderline range for short-term visual memory, and in the borderline
range for word reading, sentence comprehension, spelling and math
computation (A.R. 581-83).  Dr. Brawer diagnosed major depressive
disorder (recurrent, moderate per report), and nonverbal intellectual
functioning in the borderline to average range (A.R. 583).  Dr. Brawer
opined that Plaintiff can learn simple, repetitive tasks and likely
can perform some detailed, varied or complex nonverbal tasks (A.R.
584).  Her ability to sustain attention and concentration for extended
periods may be mildly diminished due to emotional factors (A.R. 584).
Plaintiff may have moderate limitations in her ability to manage
customary work stress and to "persist for a regular workday" (A.R.
584).  Plaintiff would be capable of following a routine but may have
moderate limitations "in organizing for high level tasks" (A.R. 584).
Plaintiff would be able to work independently on basic tasks, and may
///

have mild limitations sustaining cooperative relationships with coworkers and supervisors (A.R. 584).

Consultative examiner Dr. Sarah L. Maze Prepared a Neurological Evaluation dated June 15, 2017 (A.R. 457-60).  Plaintiff's last reported seizure was in June of 2016 (A.R. 457).  Plaintiff complained of monthly headaches for the past year (A.R. 457).  On examination, Plaintiff was cooperative with reduced insight and "somewhat simplistic speech" (A.R. 458).  She spoke very little English, recalled two out of three items after five minutes, followed simple instructions, and had impaired intelligence which appeared to be in the dull normal to borderline range (A.R. 458-59).  Dr. Maze diagnosed seizure disorder and opined that Plaintiff was capable of medium work (i.e., lifting 50 pounds occasionally, 25 pounds frequently, standing and walking six hours in an eight hour day and sitting six hours in an eight hour day), with frequent fine motor activities with her hands and legs (A.R. 459-60).

State agency physicians reviewed the record in May and July of 2017 and opined that Plaintiff's mental impairment(s) were non-severe (A.R. 109-21).  According to these physicians, Plaintiff would have no exertional limitations, but she would have some postural and environmental limitations (i.e., no climbing ladders, ropes or scaffolds, no exposure to hazards and no operation of vehicles) (id.).
///
///
///
///

1      C.   **The Hearing Testimony**

3      At the March, 2019 hearing, Plaintiff testified that she could
not work because of her epilepsy and "nerves" (anxiety) (A.R. 51).
Plaintiff said her most recent seizure occurred in January of 2018
(A.R. 51).  Prior to that seizure, Plaintiff had not suffered a
seizure in two years (A.R. 52).  Plaintiff was taking anti-seizure
medications (A.R. 52).  Plaintiff also was seeing a psychologist once
every two months for her anxiety (A.R. 52).  Her doctor reportedly
prescribed anxiety medication (A.R. 52).  According to Plaintiff, the
medication sometimes worked and sometimes did not work (A.R. 52).

13      Plaintiff had unsuccessfully applied for jobs at fast food
restaurants and at a motel (A.R. 47).  Plaintiff claimed she would
like to work, but she said employers would not hire her (A.R. 50-51).[5]

17      Plaintiff testified that she lived with her mother and spent her
days watching television, listening to music, sometimes helping with
cleaning and doing "the wash," and going to the corner store near her
house under her mother's supervision (A.R. 48-50).  When Plaintiff was

---

[5]    Plaintiff reportedly has a developmental delay and
borderline intellectual functioning (A.R. 43).  At the time of
the hearing, she was 27 years old and scheduled to finish her
high school education within a few months (A.R. 43).  Plaintiff
attended adult school – where her classes were in English – and
she passed her classes with some difficulty (A.R. 49).
Plaintiff's counsel argued that Plaintiff's intellectual
functioning would limit her to performing one- and two-step
instructions with extra supervision (A.R. 43-45).  The vocational
expert opined that, if Plaintiff were so limited, there would be
no jobs she could perform, given her other limitations (A.R. 61,
64).

going to school, Plaintiff's brother would take Plaintiff to the bus
stop, but Plaintiff would take the bus alone, to and from school,
Monday through Friday (A.R. 59-60).

Plaintiff's mother testified that Plaintiff helps out in the
kitchen at home, but only under the mother's supervision and
instruction because Plaintiff has a limited intellect and a history of
three suicide attempts (A.R. 53-55).  Plaintiff bathes with the door
open because her mother was afraid Plaintiff might have a seizure
(A.R. 56).  Plaintiff's mother said she watches Plaintiff go to the
market a block away from where they live because Plaintiff's mental
capacity is like that of a little girl (A.R. 56-57).  Plaintiff's
mother also said Plaintiff cannot be left alone (A.R. 58).

The ALJ asked the vocational expert to consider a person who
"could perform medium work" and who:

> . . . should never climb ladders, ropes or scaffolds.  They
> could occasionally climb ramps and stairs.  They could
> frequently balance, stoop, kneel, crouch, and crawl.  They
> could frequently engage in fine gross manipulation.  There
> should be no unprotected heights or dangerous machinery.  No
> operation of a vehicle.  They would be limited to simple,
> routine, repetitive tasks.  There should be no work at a
> fast pace or a production pace.  No interaction with the
> general public, and only occasional interaction with
> supervisors and coworkers.  And no jobs that require
> teamwork or close collaboration with others.

14

(A.R. 60-61).  The vocational expert purportedly identified one medium job and two light jobs such a person could perform (*i.e.*, night cleaner (DOT 358.687-101 [sic][6] medium work with a Specific Vocational Preparation ("SVP") level two); cleaner (DOT 323.687-014, light); and advertising material distributor (DOT 230.687-010, light)) (A.R. 61-62).  After some discussion, the ALJ posed another hypothetical to the vocational expert omitting the frequent manipulation limit and adding a limit to one- and two-step tasks, and the vocational expert asked for clarification regarding what the hypothetical question included (A.R. 63-64).  The ALJ replied:

> It's 50, 25, 6 or [sic] 8, 6 of 8, never climb ladders,
> ropes or scaffolds, occasionally climb ramps and stairs,
> frequently balance, stoop, kneel, crouch, and crawl. No
> unprotected heights or dangerous machinery.  No operation of
> a vehicle.  Simple routine, repetitive tasks.  These would
> be one and two-step tasks.  No fast-paced work.  No
> interaction with the general public.  Only occasional
> interaction with supervisors and coworkers.  And no jobs
> that require teamwork or close collaboration with others.

///

///

---

[6]    This DOT reference appears to have been an error. There is no entry under this number in the current DOT.  There is an entry for DOT 358.687-<u>010</u>, Change-House Attendant, which involves medium janitor-type work for locker or shower rooms. <u>See</u> DOT 358.687-010, 1991 WL 672957.  It is unclear whether the vocational expert intended to reference Change-House Attendant work in her testimony.  A housecleaner, also known as a "night cleaner," is DOT 323.687-018 and is classified as heavy work. <u>See</u>  DOT 323.687-018, 1991 WL 672784.

(A.R. 64).  The vocational expert did not identify any jobs that a person with that capacity could perform (A.R. 64).

The vocational expert testified that her testimony was consistent with the DOT and the Selected Characteristics Handbook (A.R. 64-65). At the hearing, Plaintiff's counsel did not challenge the vocational expert's testimony (A.R. 65-66).

**II.  Substantial Evidence Supports the Conclusion that Plaintiff Can Work.**

Substantial evidence supports the ALJ's conclusion Plaintiff is not disabled.  As summarized above, the consultative examiners endorsed a capacity less than, or equal to, the residual functional capacity for medium work assessed by the ALJ.  Compare A.R. 453-54, 459-60, 584 (consultative examiners' opinions finding Plaintiff was capable of medium work performing simple tasks and interacting with others) with A.R. 26-33 (ALJ's assessment).  These opinions constitute substantial evidence to support the ALJ's determination of non-disability.  See Orn v. Astrue, 495 F.3d 625, 631-32 (9th Cir. 2007) (opinion of examining physician based on independent clinical findings can provide substantial evidence to support administrative conclusion of non-disability).  The state agency physicians' opinions that Plaintiff retains a residual functional capacity for work at all exertion levels with no mental limitations provide further substantial evidence supporting the ALJ's decision.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (opinion of non-examining physician "may constitute substantial evidence when it is consistent with other

independent evidence in the record"); Andrews v. Shalala, 53 F.3d

1035, 1041 (9th Cir. 1995) (where the opinions of non-examining

physicians do not contradict "all other evidence in the record" an ALJ

properly may rely on these opinions).  Significantly, no medical

source opined that Plaintiff had materially greater limitations than

those the ALJ found to exist.  The record contains no treating

physician's opinion concerning Plaintiff's functional limitations.


    As summarized above, the vocational expert testified that a

person who "could perform medium work" with the limitations the ALJ

found to exist could work as a night cleaner, cleaner and advertising

material distributor (A.R. 61-64).  Excluding the night cleaner job

(see footnote 6 supra), the vocational expert still identified two

jobs that such a person could perform (id.).  The ALJ properly relied

on the vocational expert's testimony in denying disability benefits.

See Barker v. Secretary of Health and Human Services, 882 F.2d 1474,

1478-80 (9th Cir. 1989); Martinez v. Heckler, 807 F.2d 771, 774-75

(9th Cir. 1986).

///

///

///

///

///

///

///

///

///

///

III. **Plaintiff's Arguments are Unavailing.**[7]

Plaintiff argues that the ALJ's hypothetical questioning of the vocational expert was incomplete because the ALJ assertedly did not include a limitation to standing and/or walking six hours in an eight hour workday. <u>See</u> Plaintiff's Motion, pp. 5-7. Plaintiff also argues that the ALJ erred in finding Plaintiff capable of performing a wider range of work than Plaintiff was found capable of performing during Plaintiff's prior application for disability benefits. <u>See</u> Plaintiff's Motion, pp. 8-10.

A. **The ALJ Did Not Materially Err in the Hypothetical Questioning of the Vocational Expert.**

Social Security Ruling ("SSR") 83-10 defines "medium work" as requiring "standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday," and the same SSR provides that "sitting may occur intermittently during the remaining time." SSR 83-10, 1983 WL 31251, at *6. As detailed above, the ALJ's hypothetical question expressly included a limitation to "medium work," and the ALJ later stated "6 or 8" and "6 of 8," presumably referencing the sitting and standing/walking limitations of medium

_____

[7] The Court has considered and rejected all of Plaintiff's arguments. The Court discusses Plaintiff's principal arguments herein. Neither Plaintiff's arguments nor the circumstances of this case show any "substantial likelihood of prejudice" resulting from any error allegedly committed by the ALJ. <u>See generally</u> <u>McLeod v. Astrue</u>, 640 F.3d 881, 887-88 (9th Cir. 2011) (discussing the standards applicable to evaluating prejudice).

1    work (A.R. 60-64).   On this record, the ALJ's hypothetical questioning

2    of the vocational expert was not materially incomplete.   See Mitzi D.

3    v. Saul, 2019 WL 8112507, at *2 (C.D. Cal. Dec. 13, 2019) ("Given that

4    SSR 83-10 has been in play for over thirty years, there is no reason

5    to think the [vocational expert] understood light work to encompass

6    anything other than approximately six hours of standing or walking.");

7    James T. v. Saul, 2019 WL 3017755, at *2 (C.D. Cal. July 10, 2019)

8    ("SSR 83-10 was published in 1983.   Since that time, ALJs and

9    [vocational experts] with experience conducting social security

10   disability benefits hearings have understood medium work as requiring

11   the ability to stand or walk for up to 6 hours.   Thus, the ALJ's

12   reference to medium work supplied a 6-hour limitation on walking and

13   standing, and the ALJ did not pose an incomplete hypothetical to the

14   [vocational expert]."); see also Lawson v. Saul, 2020 WL 6055148, at

15   *4 (S.D. Cal. Oct. 13, 2020) ("numerous courts have interpreted SSR

16   83-10 to entail the ability to stand and walk for only six hours";

17   collecting cases and rejecting claim that failure to mention standing

18   and walking limitations rendered hypothetical question referencing

19   "medium work" incomplete), appeal filed, No. 20-56205 (9th Cir.

20   Nov. 17, 2020); Christopher P. v. Saul, 2020 WL 551596, at *3 (C.D.

21   Cal. Jan. 31, 2020) ("By definition, a full range of medium work

22   involves . . . standing or walking up to approximately six hours in an

23   eight-hour workday"; "the ALJ's reference to medium work in his

24   hypothetical sufficiently capture[d] the standing and walking

25   limitations"); Bailey v. Astrue, 2010 WL 1233459, at *6 (C.D. Cal.

26   Mar. 22, 2010) (because "both light and medium work by definition

27   require standing or walking approximately six hours of an eight hour

28   day," the ALJ's hypothetical, which referenced light work but not the

standing and walking limitations, was proper); but see Linda H. v.
Saul, 2020 WL 1244359, at *5 (C.D. Cal. Mar. 16, 2020) (deeming
hypothetical question regarding medium work incomplete where the ALJ
did not inquire of the vocational expert whether a person limited to
standing and/or walking six hours per day could do a job that the
vocational expert said would permit no sitting "at all").

Plaintiff argues that the Court may not conclude on this record
that the jobs identified are performable by a person limited to
standing/walking for 6 hours out of an 8 hour day. See Plaintiff's
Motion, pp. 6-7.  In so arguing, Plaintiff purports to rely on:
(1) the DOT descriptions for the jobs identified; (2) Occupational
Information Network ("ONET") data for the occupations of janitor and
cleaner, maid and housekeeping cleaner, and production worker;
(3) "Occu Collect" data provided by Plaintiff to the Appeals Council
at A.R. 314-74;[8] and (4) "commonsense understanding."  Plaintiff's
argument is unpersuasive.

First, the DOT does not address standing/walking requirements;
the DOT addresses a "strength" requirement in terms of "pounds of

---

[8]   A colleague of the undersigned recently observed that:

Occu Collect is a for-profit company and historical
archive, for which Plaintiff's attorney [Lawrence D.
Rohlfing] is the president and has a 51% financial
interest.

See Tommy D. J. v. Saul, 2021 WL 780479, at *3 n. 3 (C.D. Cal.
Mar. 1, 2021) (citations and quotations omitted) (Occu Collect is
a "non-DOT" source of alternative job information; ALJ need not
reconcile conflicts between a vocational expert's testimony and a
non-DOT source).

force" exerted.  See, e.g., DOT 323.687-010, 1991 WL 672782 (Cleaner, Hospital); DOT 230.687-010, 1991 WL 672162 (Advertising-Material Distributor).

Second, the non-DOT sources Plaintiff cites are not conclusive regarding the standing requirements for the jobs the vocational expert identified.  The ALJ was not presented with these sources and, even if the ALJ had been presented with these sources, the ALJ would have had no duty to consider whether the vocational expert's testimony was consistent with these sources.  See Shaibi v. Berryhill, 883 F.3d 1102, 1108-10 (9th Cir. 2017) ("Shaibi") (when a claimant who is represented by counsel fails to challenge a vocational expert's job numbers during administrative proceedings, the claimant forfeits such a challenge on appeal;[9] an ALJ need not resolve conflicts between vocational expert testimony and a source other than the DOT, and an ALJ need not inquire sua sponte into the foundation for the expert's opinion), as amended (Feb. 28, 2018); see also Talley v. Saul, 2020 WL 8361923, at *1 (C.D. Cal. Dec. 17, 2020) (collecting cases rejecting claims that vocational expert testimony conflicted with ONET and Occu Collect information; ALJ did not have to consider whether the vocational expert's testimony was consistent with these sources), appeal filed, No. 21-55071 (9th Cir. Jan. 28, 2021).  Here, the ALJ properly determined from the testimony of the vocational expert that

_____

[9]    Because the administrative decision in the present case is adequately supported for the other reasons discussed herein, this Court need not and does not determine whether Shaibi's forfeiture-related holding survives the United States Supreme Court's recent decision in Carr v. Saul, 2021 WL 1566608 (U.S. April 22, 2021).

the expert's opinions did not conflict with the DOT.  There was no obvious conflict between Plaintiff's limitation to standing and walking six hours in an eight-hour day and the jobs the vocational expert identified.

**B.    The ALJ Did Not Materially Err in Finding Plaintiff Capable of a Greater Residual Functional Capacity than the Capacity Found During the Prior Administrative Proceedings.**

Plaintiff argues that the ALJ erred in finding Plaintiff capable of medium work with occasional interaction with supervisors and coworkers and no work involving teamwork or cooperation, because, during prior administrative proceedings, Plaintiff had been found capable of light work with only superficial and incidental contact with others.  See Plaintiff's Motion, pp. 8-10 (citing Chavez and Social Security Acquiescence Ruling 97-4(9)).

The prior ALJ found that Plaintiff had severe epilepsy and depression, not otherwise specified, and retained a residual functional capacity for a range of light work which would not require any interaction with others apart from superficial and incidental contact (A.R. 77, 79).  The prior ALJ also found Plaintiff not disabled (id.).  The prior ALJ's decision was upheld on appeal and is final.  See A.R. 91-108 (Appeals Council's denial of review and this Court's order affirming the administrative decision on review).

Acquiescence Ruling 97-4(9), 1997 WL 742758 (adopting Chavez), applies to cases such as this one involving a subsequent disability

22

claim with an unadjudicated period arising under the same title of the
Social Security Act as a prior claim in which there has been a final
administrative decision that the claimant is not disabled.  A previous
final determination of nondisability creates a presumption of
continuing nondisablity in the unadjudicated period. Id.; Lester v.
Chater, 81 F.3d 821, 827 (9th Cir. 1995).  To overcome the presumption
of nondisability, a claimant bears the burden of proving changed
circumstances.  See Chavez, 844 F.2d at 693.  Such changed
circumstances include the alleged existence of impairment(s) not
previously considered.  See Acquiescence Ruling 97-4(9), 1997 WL
742758 at *3; Lester, 81 F.3d at 827 (same; "claimant need not . . .
demonstrate that his medical or psychiatric condition has worsened to
show changed circumstances").

     In the present case, Plaintiff asserted that she was unable to
work due in part to her "nerves" (anxiety), an impairment Plaintiff
had not alleged specifically during the prior administrative
proceedings.  Compare A.R. 51 (Plaintiff's allegations) with A.R. 77-
83 (prior ALJ's decision discussing Plaintiff's alleged impairments).
Accordingly, the ALJ discerned "new and material evidence
demonstrating 'changed circumstances'" to overcome the presumption of
continued nondisability.  See A.R. 21.  As summarized above, the ALJ
then proceeded through the sequential analysis and found Plaintiff
capable of a range of medium work which allowed for occasional contact
with supervisors and coworkers (A.R. 22-33).  Plaintiff argues that
the ALJ thereby erred by assigning a different residual functional
capacity, which assessed greater abilities.  See Plaintiff's Motion,

p. 8 (citing Chavez[10] and Acquiescence Ruling 97-4(9) to argue that
factual findings carry a continuing presumption of application on
future claims).

Acquiescence Ruling 97-4(9) provides that where, as here, a
claimant rebuts the presumption of continuing nondisability, the
adjudicator must give effect to certain findings from the decision on
the prior claim while adjudicating the subsequent claim:

> . . . adjudicators then must give effect to certain findings
> . . . contained in the final decision by an ALJ or the
> Appeals Council on the prior claim, when adjudicating the
> subsequent claim.  For this purpose, this Ruling applies
> . . . to a finding of a claimant's residual functional
> capacity . . . which was made in the final decision on the
> prior disability claim.  Adjudicators must adopt such a
> finding from the final decision on the prior claim in
> determining whether the claimant is disabled with respect to
> the unadjudicated period unless there is new and material
> evidence relating to such a finding. . . .

Acquiescence Ruling 97-4(9), 1997 WL 742758 at *3.  Here, the ALJ
generally found there was "new and material" evidence without further
discussion of the prior decision.  The ALJ then proceeded through the
sequential evaluation process, discussing Plaintiff's allegations and
the updated record, which included new medical source statements

---

[10]     Plaintiff's subsequent argument that Chavez is "dead,"
even if correct, would not affect the result herein.

opining that Plaintiff was capable of medium work with some contact with others (A.R. 21-33).  Where, as here, an ALJ relies entirely on medical evaluations conducted after a prior adjudication, the ALJ is not required to give preclusive effect to findings from the prior adjudication.  See, e.g., Trofimuk v. Commissioner, 2014 WL 794343, at *5 (E.D. Cal. Feb. 27, 2014); see generally Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173 (9th Cir. 2008) (evaluations presented after a prior nondisability determination necessarily presented "new and material" information not presented to the first ALJ).

Assuming, arguendo, the ALJ erred, any error was harmless.  In the prior action, the vocational expert testified, and the ALJ found, that light work jobs could be performed by a person having the limitations the prior ALJ found to exist (A.R. 85).  All of those findings were upheld on appeal (A.R. 91-108).  If, in the present case, the ALJ had adopted the more restrictive residual functional capacity from the prior decision, Plaintiff still would not have been deemed disabled.

///
///
///
///
///
///
///
///
///
///

**CONCLUSION**

For all of the foregoing reasons, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: April 28, 2021.

_____/S/_____
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE